IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| v. | : | CRIMINAL NOS. 24-275-GJP |
| | | 25-034-GJP |
| **SERJ GEVORGYAN** | : | |
| a/k/a Seryozha Gevorgyan | | |
| a/k/a Seryohaugurgen Gevorgyan | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorneys, David Metcalf, United States Attorney for the Eastern District of Pennsylvania, Mary E. Crawley, Assistant United States Attorney, and Megan Curran, Special Assistant United States Attorney, respectfully submits this sentencing memorandum to assist the Court in imposing sentence upon the defendant, Serj Gevorgyan. Defendant Gevorgyan engaged in two separate and distinct fraud schemes over a sustained period of time. In the first, he schemed to defraud two different financial institutions -- People's Security Bank and Santander Bank -- by applying for commercial loans for a shell company, Vincentown Systems, that Gevorgyan set up with a synthetic identity. In his second scheme, Gevorgyan repeatedly impaired and obstructed the lawful functioning of the U.S. Department of Transportation ("DOT") by falsely obtaining government authority to operate trucking companies that were, in reality, "shell" companies that performed no legitimate transportation services but that instead re-contracted their transportation jobs to other, unsuspecting truckers, some of which were never paid for their work. For the reasons provided below, the government recommends a sentence of imprisonment within the advisory guideline range, absent any basis for a below-guideline sentence addressed in the supplemental sealed attachment to this sentencing memorandum.

The Court has scheduled the sentencing hearing in this case for March 3, 2026 at 10:00 a.m.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1]

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors.

I.  **BACKGROUND**

On July 30, 2024, a grand jury in this district returned an indictment filed at Criminal No.

---

[1] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

24-275-GJP ("the indictment") charging defendant Serj Gevorgyan, a/k/a "Seryroyzha Gevorgyan," a/k/a "Seryohagurgen Gevorgyan," with two counts of bank fraud, in violation of 18 U.S.C. § 1344, and two counts of conducting a monetary transaction of $10,000 or more in criminally derived property, in violation of 18 U.S.C. § 1957. These charges arose from the defendant's participation in a scheme to defraud financial institutions out of approximately $970,000 and willfully causing monetary transactions of $10,000 or more in such fraud proceeds, from at least 2019 through October 2020.

On January 29, 2025, Gevorgyan was charged by information, waiving prosecution by indictment, with one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, filed at Criminal No. 25-034 ("the information"). This charge arose from the defendant's participation in a dual-object conspiracy to (1) defraud the United States, specifically the United States Department of Transportation ("USDOT"), and (2) make false statements in violation of 18 U.S.C. § 1001, between in or about November 2018 through in or about late 2023.

## II.  SENTENCING CALCULATION

### A. Statutory Maximum Sentence

Indictment: Criminal No. 24-275

Counts 1-2 (Bank Fraud --18 U.S.C. § 1344): 30 years' imprisonment per count, 5 years of supervised release, a $250,000 fine per count, and a $100 special assessment per count.

Counts 3-4 (Money Laundering --18 U.S.C. § 1957): 10 years' imprisonment per count, 3 years of supervised release, a $250,000 fine per count, and a $100 special assessment per count.

Total Maximum Sentence on Criminal No. 24-275 is: 80 years' imprisonment, 5 years of supervised release, a $1,000,000 fine, and a $400 special assessment. Full restitution of as much as $893,424 also shall be ordered. Forfeiture of any property which constitutes or is derived from proceeds obtained directly or indirectly from the offenses also may be ordered.

Information: Criminal No. 25-034

Count 1 (Conspiracy – 18 U.S.C. § 371): 5 years' imprisonment, 3 years of supervised release, a $250,000 fine, and a $100 special assessment.

Total Maximum Sentence on Criminal No. 25-034 is: 5 years' imprisonment, 3 years of supervised release, $250,000 fine and a $100 special assessment. Full restitution of $25,350 also shall be ordered. Forfeiture of any property which constitutes or is derived from proceeds obtained directly or indirectly from the offense also may be ordered.

Based on his pleas of guilty to the indictment and the information, the total statutory maximum sentence that may be imposed on the defendant is 85 years imprisonment, a five-year period of supervised release, a $1,250,000 fine, and a $500 mandatory special assessment.

The Court shall also impose restitution in the amount of $893,424 in connection with Counts One through Two of the indictment filed at Criminal No. 24-275 and restitution of $25,350 in connection with the information filed at Criminal No. 25-34, and may impose forfeiture of $526,024.

      B.      Sentencing Guidelines Calculation

In the Presentence Report ("PSR"), the Probation Office correctly calculated defendant Gevorgyan's advisory guideline imprisonment range as 87 to 108 months. PSR ¶ 106.

      1.  Grouping

The counts of the indictment and the information comprise one group, pursuant to U.S.S.G. § 3D1.2(d), as the Guidelines determine the offense level for these offenses on the basis of the total amount of loss. PSR ¶ 51.

      2.  Base Offense Level

The defendant's base offense level is calculated pursuant to U.S.S.G. § 2S1.1. PSR ¶ 52. As calculated in the PSR, the defendant's base offense level is 7, pursuant to U.S.S.G. § 2B1.1(a)(1)(A) and (B). The offense level is increased by sixteen levels, to 23, under U.S.S.G.

4

§ 2B1.1(b)(1)(I), because the loss is $1,516,256, which is more than $1,500,000 but less than $3,500,000. The offense level is further increased by two levels under U.S.S.G. § 2B1.1(b)(10)(B) and (C), to 25, because a substantial part of the fraudulent scheme charged in the information was committed from outside of the United States and the offenses charged in both charging documents also involved sophisticated means. The offense level is further increased by two levels, to 27, as the defendant created a synthetic identity using the personal identifying information of another, pursuant to U.S.S.G. § 2B1.1(b)(11)(A)(ii), (B)(ii) and (C)(i).

       3. Specific Offense Enhancement, Money Laundering

As calculated in the PSR, the defendant's offense level should be increased by one level, to 28, under U.S.S.G. § 2S1.1(b)(2)(A), because the defendant was convicted under 18 U.S.C. § 1957. PSR ¶ 53.

       4. Organizer/Leader

As calculated in the PSR and stipulated to in the plea agreement, the defendant's offense level should be increased by an additional four levels, to 32, under U.S.S.G. § 3B1.1(a), because the defendant was an organizer or leader of criminal activity involving five or more participants. PSR ¶ 55.

       5. Acceptance of Responsibility

The PSR properly concluded that the defendant does qualify for a three-level offense level reduction for acceptance of responsibility. PSR ¶ 58-59.

       6. Final Offense Level

With a total offense level of 29, the defendant's sentencing guideline range is 87 to 108 months of imprisonment. PSR ¶ 106.

### III. ANALYSIS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### Consideration of the 3553(a) Factors

1. **The nature and circumstances of the offense.**

Defendant Gevorgyan engaged in two separate and distinct fraud schemes. In the first, he schemed to defraud two different financial institutions -- People's Security Bank and Santander Bank -- by applying for commercial loans for a shell company, Vincentown Systems, that Gevorgyan set up with a synthetic identity. In connection with this scheme, the defendant utilized the name, date of birth and social security number of his uncle, R.A., in order to create a synthetic identity.[2] To further this scheme, Gevorgyan found an individual to "pose" as R.A. and paid this individual to pretend to the banks that he was R.A. Gevorgyan utilized this individual's face to take a photograph and to have that photograph placed on a fraudulent driver's license created using this individual's face, along with R.A.'s name, date of birth and other identifiers. The defendant even transferred title of a condominium he owned, into the name of the synthetic identity, to further conceal from the banks the facts that (1) R.A. was not present in the United States, and (2) R.A. was not the true applicant for these loans.

Gevorgyan submitted the false and misleading loan applications and supporting documentation, including false tax returns and financial statements, as well as false bank statements, all to receive loan proceeds to which he was not entitled.

The evidence established that defendant was introduced to this scheme through a related defendant, recently sentenced, who was charged under Criminal No. 24-280 (the "related defendant"). Defendant Gevorgyan looked to the related defendant for advice, as he was something of an authority figure within the Armenian community, at a time when Gevorgyan

---

[2] A synthetic identity is a false identity comprised of various forms of personal identifying information, combined to create a new, fraudulent identity. The forms of information often included stolen or fictitious social security numbers and/or stolen or fictitious driver's license numbers. The new synthetic identity is then used to secure loans and lines of credit based on the new, fraudulent identity.

7

was learning how to commit bank fraud, in an effort to support his young family by criminal means. The related defendant introduced Gevorgyan to another defendant, previously sentenced within the Eastern District of Pennsylvania (the "second defendant"), who tutored Gevorgyan on the process of fraudulently obtaining these loans. The second defendant further required payment of 30% of the value of the fraudulent loan, which defendant Gevorgyan did pay.[3] While Gevorgyan fully accepted responsibility for his crimes and never asked the government for leniency based on his need for guidance in committing bank fraud, the fact remains that Gevorgyan looked to other Armenian nationals within his community for help in executing his bank fraud scheme.

Later, after committing his bank fraud scheme, Gevorgyan ran a years-long conspiracy to obstruct and impede the lawful functioning of the U.S. Department of Transportation ("DOT"), the agency responsible for regulating motor carriers (e.g. trucking companies) including by prescribing and enforcing safety regulations involving the use of commercial vehicles. As part of this scheme, the defendant created a number of shell trucking companies in the names of others (thus hiding that the defendant controlled them all) that did not actually perform transportation services. The defendant submitted false applications (MCSA-1s) to DOT seeking permission to operate these trucking companies, knowing that his shell companies would perform no actual transportation work but that the defendant would instead accept transportation assignments from legitimate brokers but then re-contract these assignments to other, unsuspecting truckers at a lower price without the brokers' knowledge. The defendant would then pocket the difference between what the broker paid his shell companies and what the defendant paid the trucker who

---

[3]   The government confirmed that the second defendant was sentenced on September 12, 2024 by the Honorable John M. Younge, United States District Judge, to 120 months' imprisonment for the second defendant's own financial crimes and fraud schemes.

actually transported the goods, or sometimes the defendant would not pay the trucker at all. This practice is known in the trucking industry as "double-brokering skimming," and it obscures from DOT's vision the actual carrier and broker involved in any given transportation assignment, which can lead to cargo theft and safety issues.

The details of this scheme were as follows. Gevorgyan, while primarily present in the United States, established a call center located in Armenia with the assistance of his brother-in-law, who was present in Armenia. At the call center, the employees scanned the trucking load boards to find loads that shippers wanted moved, then agreed with the broker that the numerous purported trucking companies that Gevorgyan had formed and oversaw would transport the cargo freight at a negotiated price. But after agreeing with the freight brokers that the shell companies would transport the cargo freight, at these negotiated prices, Gevorgyan and the call center employees in Armenia would turn around and contract with other legitimate and unsuspecting motor carriers to transport the cargo freight for lower prices, with Gevorgyan and his companies keeping the difference. Gevorgyan and those working for him then profited from that difference. This was double-brokering skimming.

As stipulated in the plea agreement, Gevorgyan caused at least $622,832 of loss by this fraud. While not the original plan of Gevorgyan's scheme, the evidence established that some of the persons working at Gevorgyan's direction and following the fraudulent scheme he established, contracted with other, legitimate, unsuspecting motor carriers to transport the cargo freight, but once the legitimate motor carriers had delivered the cargo freight, they did not pay the legitimate motor carriers at all, that is, they committed double brokering theft. The risk of double brokering theft is one of the reasons for DOT's stringent monitoring of the trucking industry, which monitoring is undermined when bad actors, like the defendant, lie to the DOT

about who controls their trucking companies. USDOT received a number of complaints by truckers who did not receive their payment after being victimized through double brokering theft traced to Gevorgyan's fraudulently established trucking companies. At least 14 truckers registered complaints with the Federal Motor Carrier Safety Administration for a total loss to these truckers of $25,350. Once the information was filed, USDOT publicized Gevorgyan's scheme, suspecting that there were many more trucker victims, but no others came forward. The agency was not surprised at this, since USDOT is aware that often truckers chalk up not being paid as a cost of doing business, and do not make reports of such theft.

As evidenced by those truckers who took the time to make complaints, double-brokering theft and skimming both cause numerous harms. These illegal activities harm all parties, including shippers, brokers, and carriers, by causing delivery delays, damaged goods, and lost revenue, with the potential for stolen goods to be held for ransom. On its own, double-brokering theft can have severe consequences for shippers, carriers, and brokers, including financial losses from non-delivery or non-payment, damaged or lost goods, inflated costs, and legal disputes. It disrupts supply chains, creates liability issues, and damages reputations.

Both of the defendant's frauds were serious crimes in their own right, and taken together the nature and circumstances of these offenses compel a significant sentence.

2. **The history and characteristics of the defendant.**

Defendant Gevorgyan is 36 years old. PSR p. 3. He is a naturalized citizen, who emigrated to the United States from Armenia. *Id.* He is a married father of three who, prior to the instant arrest, resided with his family in Richboro, Pennsylvania, in a home he purchased in January 2021. PSR ¶ 75.

Gevorgyan reports that he was raised in a two-parent household in his home country of Armenia. PSR ¶ 72. His upbringing was impacted by the fall of the Soviet Union but he maintains close relationships with both parents, who are currently residing with his wife while he is incarcerated. PSR¶ 70, 72.

Gevorgyan first entered the United States with his wife in 2013, originally residing in Glendale, California before moving to Pennsylvania in 2015. PSR ¶ 74. He has a college degree in International Relations from Yerevan University in Armenia. PSR ¶ 89. The defendant has experience and training in IT as well as a ServSafe Certification. The defendant reports that he received firearms training while serving in the Armenian military. PSR ¶ 90.

Before charges were brought in this case, the defendant had no prior contacts with law enforcement in the United States. PSR ¶ 106.

Given his family background including escaping a life and childhood ravaged by war, obtaining an advanced education, and gaining citizenship through asylum, it is disheartening to review the extensive deception Gevorgyan chose to engage in against financial institutions and the government that had taken him in.

> 3. **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.**

A custodial sentence is also needed to reflect the seriousness of the offenses, promote respect for the law, and provide just punishment for the offenses. As the Court is aware, fraud against entities such as banks is sometimes seen as less serious than financial crime against individual victims. But financial crime against banks is harmful, requiring a significant sentence. And as explained above, pp. 8-9, fraud against USDOT causes serious harms as well, making a significant sentence appropriate in this case.

4.  **The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

Gevorgyan's successful operation of two very different fraud schemes, both sophisticated, and one international in scope, shows that there is a strong need to impose a sentence that will specifically deter him from committing fraud post-release and protect the public from further fraud schemes by the defendant. There is an equal if not greater need to impose a sentence that generally deters others from committing fraud schemes like those perpetrated by the defendant.

5.  **The need to avoid disparities among defendants with similar records**

Section 3553(a)(6) instructs courts to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." While bank fraud is sadly very common, double-brokering theft is less so, while being difficult to detect and prosecute.

In the government's view, the advisory Guidelines range appropriately reflects the seriousness of defendant Gevorgyan's offenses. A key driver of that range is the 16-level enhancement for a loss amount of more than $1.5 million, pursuant to U.S.S.G. § 2B1.1(b)(1)(I).

6.  **Other factors.**

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

7.  **The need to provide restitution to victims of the offense.**

As agreed to in the plea agreement, the defendant will pay restitution in the amount of $893,424 in connection with the bank fraud offenses. The government respectfully requests this Court order restitution be paid to:

1. Santander Bank $602,556

    Santander Bank, N.A.
    Attn: Case Management – Mail code RI-EPV-FRD
    95 Amaral Street
    East Providence, RI 02915

2. People's Security Bank $290,868

    Peoples Security Bank & Trust
    Reference: Loan #13600018537
    Attn: Ian Matlack
    600 W. DeKalb Pike, Suite 210
    King of Prussia, PA 19406

The plea agreement provided that the defendant agreed to pay restitution for the double-brokering fraud scheme in an amount "up to $622,832." While the scheme caused an identifiable fraud loss, no restitution is owed directly to the Department of Transportation based on the double-brokering skimming scheme. The Department of Transportation did make extensive attempts to notify victims of the more limited double-brokering theft scheme, but received few responses from the truckers who were the victims. Thus Gevorgyan owes restitution directly to fourteen identified victims of the double-brokering theft scheme, in the total amount of $25,350. These victims had previously sent complaints to the FMSCA National Consumer Complaint Database (NCCDB) and their restitution information is reflected in the attached Exhibit A, requested to be filed under seal.

### 8. Supervised Release

In this case, a term of supervised release of two years is warranted. Close supervision following release from imprisonment is warranted to aid his reentry to society and to protect the public. A term of supervised release in this case advances the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B), protect the public, § 3553(a)(2)(C), and pays restitution to victims, § 3553(a)(7).

## IV.  CONCLUSION

For the foregoing reasons, the government is seeking a significant sentence of incarceration consistent with all the factors under Section 3553(a), and after taking into consideration the factors, if any, addressed in the Sealed Supplement; an order of restitution of $893,424 in connection with Counts One and Two of the indictment filed at Criminal No. 24-275; an order of restitution of $25,350 in connection with the information filed at Criminal No. 25-34; a forfeiture order in the amount of $526,024, and a total special assessment of $500.

Respectfully submitted,

DAVID METCALF
United States Attorney


/s *Mary E. Crawley*
MARY E. CRAWLEY
Assistant United States Attorney

/s *Megan Curran*
MEGAN CURRAN
Special Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was served by email on the defense counsel and U.S. Probation Officer listed below:

Pantellis Palividas, Esquire
ellis@ellis-legal.com

Sara E. Donson
United States Probation Officer

                                        */s/ Megan Curran*
                                        MEGAN CURRAN
                                        Special Assistant United States Attorney

Date:   February 19, 2026